5:19mj31-MJF

# AFFIDAVIT

I, John Manna, being duly sworn hereby depose and say:

## TRAINING AND EXPERIENCE

1. I am a Special Agent ("S/A") for the Drug Enforcement Administration

("DEA") and have been so employed for over 28 years. I am currently assigned to

the DEA Panama City Resident Office. During my employment with the DEA, I

have participated in approximately nine hundred and fifty (950) narcotics

investigations, many of which included physical surveillance, the execution of

search warrants, working in an undercover capacity, and the arrest of numerous

drug traffickers. I have spoken with more than 1000 defendants, confidential

informants, and witnesses having extensive knowledge of the workings of major

narcotics trafficking organizations. Through these investigations, my training and

experience, and conversations with other law enforcement personnel, I have

become familiar with methods used by traffickers to smuggle and safeguard

narcotics, distribute narcotics, and collect and launder related proceeds. I am

aware of methods employed by major narcotics organizations to thwart any

investigation of their illegal activities. During my work as a Special Agent, I have

worked in an undercover capacity, where I have purchased illegal drugs, or

negotiated for the purchase or sale of drugs, over 300 times. I have made

RCVD USDC FLND PC
JUN 21 '19 AM10:03

1

thousands of undercover telephone calls and text messages, during which I

conducted negotiations for the purchase or sale of drugs.

2.  This affidavit is made in support of an application for the issuance of a

search warrant for the residence of Ronnie Johnson (hereinafter referred to as the

"**Subject Premises**") which I respectfully submit contains evidence of an on-going

conspiracy to distribute controlled substances, and possession of controlled

substances with the intent to distribute, in violation of Title 21, United States Code,

Sections 841(a)(1), and 846.  The Subject Premises is specifically described in

Attachment A, and the items I seek authorization to search and seize are

specifically described in Attachment B.

## DETAILED DESCRIPTION OF THE SUBJECT PREMISES

3.  The **Subject Premises** is located at 323 Michele Drive, Callaway,

Florida.  The **Subject Premises** is further described as a single-family dwelling

with an attached garage, white trim, and a brown shingle roof located inside the

Forest Walk Subdivision.  The front of the dwelling has a brick face.  The back of

the dwelling is off-white siding.  The north side of the dwelling is white siding.

The numbers "323" are in grey numerals on a white placard, which is mounted

above a white garage door on the front of the dwelling.  The front door is white in

color and faces to the east. There is a cement driveway that leads to a two-car attached garage. **PROBABLE CAUSE**

### **BACKGROUND OF THE INVESTIGATION**

4. Since August 2017, the DEA and other law enforcement agencies have conducted an investigation into a cocaine trafficking network operating in Panama City Beach, Florida, and its surrounding area. Law enforcement identified one of the cocaine suppliers in this network as Ronnie Johnson, who coordinates the shipment of multi-kilograms of cocaine from other locations to Panama City, Florida, where then Johnson sells the cocaine to other drug dealers. Based on the facts set forth in this affidavit, Johnson's residence was identified as the **Subject Premises**.

5. Law enforcement surveillance, and intercepted communications obtained pursuant to court orders, show that Johnson is a cocaine dealer in this network. The evidence obtained through these investigative methods, which are set forth in this affidavit, show that from September 2017 to the present, Johnson sold cocaine to numerous customers in Panama City, Florida.

6. Information obtained during the investigation, which is set forth in this affidavit, shows that Johnson stored drugs at the **Subject Premises** during the course of this investigation. Observations made by law enforcement and

information obtained from the utility company, which are set forth in this affidavit, show that Johnson resides in the **Subject Premises** with Fekecia Manley.

7.  Your affiant was able to identify the individuals named in this affidavit by various methods, which included photo identification, use of known phone numbers that were corroborated by wire intercepts, and surveillance after such wire intercepts to substantiate identification.  During the investigation, the DEA was authorized to conduct wire intercepts on telephone numbers being used by Johnson, as well as other telephone numbers used by individuals distributing cocaine.  The wire intercept also authorized the interception of text messages, which is a common communication method.

**CONFIDENTIAL SOURCES**

8.  In March 2019, law enforcement began utilizing a Confidential Source (hereinafter referred to in this affidavit as the "CS"), who was previously a target of this investigation.  For the purpose of this affidavit, the CS will be referred to as the CS throughout this affidavit, even though the CS was not cooperating with law enforcement until March 2019.  The CS is cooperating with law enforcement in an effort to gain favorable treatment in connection with pending state criminal charges arising from this investigation.  Since the CS began cooperating, law enforcement has corroborated much of the information provided by the CS.  Law enforcement

4

did not find any of the information provided by the CS to be false or misleading. The CS's criminal history according to the NCIC database shows the CS was arrested on October 7, 2002, for fraudulent use of credit card; on October 25, 2002, for grand theft; on March 12, 2004, for burglary and grand theft; on May 09, 2004, for possession of marijuana less than 20 grams; on October 18, 2005, for motor vehicle theft; on May 18, 2006, for uttering a false instrument, altering a public record and petit theft; on June 19, 2006, for trespassing, on November 21, 2006, for burglary and grand theft; on December 1, 2006, for grand theft over twenty thousand dollars; on December 19, 2009, for violation of probation; on July 11, 2010, for driving while license was suspended; on December 15, 2010, for violation of probation; and on March 9, 2018, for grand theft.

## INTERCEPTION OVER TELEPHONES USED BY THE CS

9.   During the investigation, DEA Task Force Officers, who are state and county law enforcement officers that are cross-deputized as federal officers, obtained numerous orders from the court in Florida's Fourteenth Judicial Circuit authorizing the interception of wire communications over cellular devices used by members of this drug trafficking organization.    DEA TFOs obtained state authorizations for wire intercepts, as opposed to federal authorizations, based on what was then believed to be the quantity of controlled substances involved in the

investigation. While federal prosecutors may have been initially informed of the investigation, federal prosecutors did not receive continuous briefings, review or oversee the investigation and provided no input as to the affidavits involved in state wire interceptions. Through the information learned during these intercepts and surveillance, law enforcement identified the CS as a cocaine dealer to numerous other drug dealers in Bay County, Florida. In an attempt to identify the CS' cocaine supplier, DEA TFOs obtained an order from the court in Florida's Fourteenth Judicial Circuit to intercept communications over the cellular device used by the CS.

**Interceptions over Target Telephone 5 (CS)**

10. On August 22, 2018, the Honorable John Fishel II, Circuit Court Judge for Florida's Fourteenth Judicial Circuit, signed an Order authorizing interception of wire and electronic communications, and obtaining global positioning services and location data occurring on telephone number (850) 303-1402, hereinafter referred to as "Target Telephone 5." The interception of wire and electronic communications occurring over Target Telephone 5 commenced on August 23, 2018. This telephone number was used by the CS, who was not cooperating with law enforcement at this time in the investigation.

11.    During the time DEA intercepted communications over Target Telephone 5, intercepted calls and text messages, in conjunction with law enforcement surveillance, showed that the CS sold cocaine to numerous customers in Bay County, Florida.    The information obtained through intercepted communications also showed that Ronnie Johnson ("Johnson") was one of the cocaine suppliers used by the CS.

**Johnson Delivers Five Ounces of Cocaine to the CS on August 27, 2018**

12.    Intercepted communications, law enforcement surveillance, and information provided by the CS show that on August 27, 2018, Johnson delivered five ounces of cocaine to the CS at the Dollar General Store on Cherry Street, Panama City, Florida.    At the time of this event, the CS was not cooperating with law enforcement.    The following are some, but not all, of the intercepted texts messages and telephone calls, defendant information, and the observations made by law enforcement that substantiate this:

a. On August 27, 2018, at approximately 10:17 a.m., the CS, using Target Telephone 5, placed a call to (615) 879-0618, and spoke to Johnson.    During the call, the CS said, "...I'll be ready for you whenever you ugh, you get off..." Johnson said, "What you trying to do?    The CS responded, "five."    Johnson asked, "What made you come back?    The CS responded, "...I've been back the last

7

couple weeks, but, fucking I've just been picking up a little bit trying to build my money back up so I can call you." The CS told Johnson to call him when Johnson was leaving Lynn Haven. It is my opinion, based on this investigation, that Johnson is a cocaine supplier and in this call, the CS wanted to get five ounces of cocaine from Johnson. Johnson asked the CS what he was trying to do, and the CS responded without any detail, "Five." Johnson did not ask for any explanation, but responded by asking why the CS had come back. I believe that Johnson is a higher level drug dealer than the CS because the CS told him that the CS was trying to "build my money back up" so that the CS could call Johnson.

b. On August 27, 2018, at approximately 12:27 p.m., the CS, using Target Telephone 5, received a call from (615) 879-0618, and spoke to Johnson. During the call, Johnson said that he was in the "Cove." The CS said he was heading back to the "Cove." Johnson said that he would "pull up on you." Your affiant knows that there is a residential area in Panama City, Florida, that is called the Cove. Your affiant also knows that the CS maintains a residence in the Cove. Based on that, I believe that the CS and Johnson agreed to meet at the CS's residence. Your affiant also believes, based on the previous call described in this paragraph, that Johnson planned on delivering five ounces of cocaine to the CS.

c. On August 27, 2018, at approximately 12:45 p.m., law enforcement

surveillance saw the CS arrive at the parking lot across the street from his residence in the Cove, driving a white Dodge pickup truck. The CS exited the pickup truck and walked into the condominium building in the Cove.

d.  On August 27, 2018, at approximately 1:08 p.m., the CS, using Target Telephone 5, received a call from (615) 879-0618, and spoke to Johnson. During the call, the CS said he/she was "at the house." Johnson said that he was pulling down the road right now. The CS told Johnson to pull up by the dumpster across the street. Johnson said, "the police, a black and white...police right there behind..." The CS then suggested that Johnson and the CS meet at the Dollar Store. Johnson explained that the police were on the same road but at someone's house. The CS said "I'm coming down." It is my opinion, based on this call and the previous call, that Johnson and the CS were meeting so that Johnson could sell five ounces of cocaine to the CS.

e.  Based on the conversation during that call, law enforcement surveillance left the area so that the investigation would not be compromised.

f.  On August 27, 2018, at approximately 1:10 p.m., the CS, using Target Telephone 5, received a call from (615) 879-0618, and spoke to Johnson. During the call, Johnson said, "...I just pulled in this god damn parking lot..." Johnson asked, "I see, you see me?"

9

g. On August 27, 2018, at approximately 1:19 p.m., the CS, using Target Telephone 5, placed a call to telephone number (850) 348-6680, and spoke to Jamir Jackson. During the call, the CS said, "shit, just picked up that new new, going to the shop." Jackson said, "all right, I need you." The CS said, "…I got to go pick up my original cut and then go to the shop." The CS said, "…I'll be there waiting on you." Jackson replied, "Alright." I believe that this call confirms that the CS had just received more cocaine ("just picked up that new new"), which I also believe, based on the intercepted calls detailed above, he received from Johnson. I know from other intercepted telephone calls, defendant statements, and law enforcement surveillance that Jamir Jackson is one of the CS' cocaine customers.

h. Several months after this event, when the CS was cooperating with law enforcement, agents asked the CS what transpired during the CS's meeting with Johnson. The CS told law enforcement that during that meeting with Johnson, the CS purchased five ounces of cocaine.

**Johnson meets with the CS on September 1, 2018**

13. Intercepted communications over **Target Telephone 5**, **and** law enforcement surveillance outside a pizza restaurant in Panama City, Florida, confirmed that the CS met with Johnson for the purpose of paying him for the five

10

ounces of cocaine.   The following are some of examples of the intercepted telephone calls, as well as observations made by law enforcement surveillance:

a.   On September 1, 2018, at approximately 11:48 a.m., the CS, using **Target Telephone 5**, placed a call to telephone number (615) 879-0618, and spoke to Johnson.  During the call, the CS said, "...I need the same thing..."   Johnson replied, "Alright shit I'm about to get up and go get it."  The CS said, "Alright homey just let me know."  (Intercepted calls on August 27, 2018, which are described above, indicate that Johnson delivered five ounces of cocaine to the CS. Therefore, when the CS said, "I need the same thing," your affiant believes that he was ordering an additional five ounces of cocaine).

b.   On September 1, 2018, at approximately 12:37 p.m., the CS, using **Target Telephone 5**, placed a call to telephone number (615) 879-0618, and spoke to Johnson.  During the call, the CS said that he was going out to eat.  Johnson said, "I'm fixing to go out the door I got to *unintelligible* to go grab it. I don't have it on me." The CS said, "...I'll let you know where we go eat at and I'll just bring the cash with me so you can pull up." Johnson responded, "Alright homey."  It is my opinion that when Johnson said "I got to *unintelligible* to go grab it. I don't have it on me," that he was referring to the cocaine.  I also believe that when the CS said, "I'll just bring the cash with me so you can pull up," that he was referring

to having the money to pay the supplier for the cocaine and that he wanted Johnson to "pull up" to the restaurant where the CS was going to eat.

    c.  On September 1, 2018, at approximately 12:56 p.m., the CS, using **Target Telephone 5**, placed a call to telephone number (615) 879-0618, and spoke to Johnson. During the call, The CS said he was going to "New York right by Best Buy." Johnson said, "…yeah I'm gonna pull up on you, but I finna go, I'm right now trying to shoot out here to grab the shit for you." The CS said, "I'm the same way. You can't keep it where you go to sleep." It is your affiant's opinion that this call shows that Johnson had to go and pick up the cocaine from a location ("to shoot out here to grab the shit for you") prior to delivering it to the CS. Your affiant also believes that the call shows that the CS wanted to meet at the New York Pizzeria at the Panama City Mall.

    d.  On September 1, 2018, at approximately 1:20 p.m., law enforcement surveillance observed the CS, and others, inside the New York Pizzeria in Panama City, Florida. At approximately 2:00 p.m., a silver Nissan Altima parked to the front of the New York Pizzeria. No one exited the vehicle. The CS walked out of the New York Pizzeria and walked over to the silver Nissan Altima. The CS entered the passenger seat of the Nissan Altima. After less than a minute, the CS got out of the Nissan Altima and walked over to his lunch mates who had exited

the restaurant and walked over to another vehicle. Agents were not able to see the driver of the Nissan Altima due to the dark window tint. Agents attempted to follow the Nissan Altima but lost the vehicle during surveillance. Agents determined that the Nissan Altima was registered to PV Holdings, a rental car company. PV Holdings' records showed that the person who rented that Nissan Altima on that date was Fekecia Manley, the person who has previously been identified as co-habitating with Johnson.

e. Law enforcement learned from the CS, after the CS began cooperating with law enforcement, that at the above referenced meeting, the CS gave money to Johnson as an advance for five ounces of cocaine. The CS said that Johnson did not give the five ounces of cocaine to the CS while at that meeting. The CS said that later that same day, he/she met with Johnson and Johnson gave five ounces of cocaine to the CS.

## INTERCEPTIONS OVER TARGET TELEPHONE 7 USED BY JOHNSON

14. On September 22, 2018, the Honorable John Fishel II, Circuit Court Judge for Florida's Fourteenth Judicial Circuit, signed an Order authorizing interception of wire and electronic communications, and obtaining global positioning services and location data occurring on telephone number (615) 879-

0618 (hereinafter referred to as Target Telephone 7). The interception of wire and electronic communications occurring over Target Telephone 7 commenced on September 23, 2019, and abruptly terminated on or about October 10, 2018, due to infrastructure damage from Hurricane Michael. According to Verizon records, there is no subscriber listed for Target Telephone 7.

**Johnson's drug trafficking activities**

15.    During the time DEA intercepted communications over Target Telephone 7, intercepted calls and text messages, in conjunction with law enforcement surveillance, showed that Johnson sold cocaine to numerous customers in Panama City, Florida. The information obtained through intercepted communications also showed that Johnson used a person, who I believe is Derek Bell, to help him sell drugs and collect drug proceeds from customers. Through the intercepted communications over Target Telephone 7, law enforcement identified Mutah Bolden of Dothan, Alabama, as one of Johnson's drug suppliers. The following are a few of the intercepted calls that establish that Johnson is a drug trafficker:

a. On September 25, 2018, at approximately 9:14 p.m., Johnson, using Target Telephone 7, placed a call to telephone number (850) 896-3312, and spoke to a black male, who your affiant believes was Derek Bell. During the call,

5:19mj31-MJF

Johnson described the residence that he was moving into. As part of the description, Johnson told Bell, "...Police stay two houses over on the left." Your affiant has driven past the **Subject Premises** at least ten times over the past eight months. On almost all of those occasions, your affiant saw a law enforcement patrol vehicle parked at a residence that was two houses away from the **Subject Premises**. The residence with the law enforcement vehicle was located on the left side of the street when looking from the **Subject Premises**.

   b. On September 26, 2018, at approximately 2:52 p.m., Johnson, using Target Telephone 7, placed a call to telephone number (850) 896-3312, and spoke to a black male, who your affiant believes was Derek Bell. During the call, Bell asked, "...get'em from him or get get'em to him?" Johnson replied, "get them to him and get the money from him." Bell asked if Johnson was still "at the crib." Johnson replied in the affirmative. The call was then disconnected. Based on my experience, your affiant knows that the term "crib" is used when referring to someone's residence. Based on that, it is my opinion that when Johnson said that he was "at the crib," he was referring to being at the **Subject Premises**. It is also my opinion that when Johnson said "get them to him" that he was referring to Bell delivering cocaine to a person, and when Johnson continued and said "and get the

15

money from him," that he was instructing Bell to collect money for the cocaine from that same person.

c. On September 26, 2018, at approximately 2:52 p.m., Johnson, using Target Telephone 7, placed a call to telephone number (850) 896-3312, and spoke to a black male, who I believe is Derek Bell. During the call, Bell said "...I got about, bout, two of them bitches left." Johnson replied, "...I'm gonna get you right tonight." Johnson said, "Don't give him all the rock god dammit." Bell asked, "...how many you want to get him started. Give him about two...?" Johnson replied, "Nah, I'm thinking two or three sand and four hard..." Bell replied that he understood saying, "I'm going to handle that shit right now." It is your affiant's opinion that this call shows that Bell sells cocaine at the direction of Johnson. I believe that when Bell said that he had "two of them bitches left" that he was referring to having two ounces of cocaine. I also believe that when Johnson replied that he was going to "get you right tonight" that he was referring to supplying Bell with more cocaine. I know that cocaine dealers refer to cocaine hydrochloride (HCL) as "sand" and cocaine base as "rock" or "hard." Based on that, it is my opinion that when Johnson said not to "give him all the rock" that he was referring to not giving a person all the cocaine base. I believe that when Bell asked Johnson "how many you want to get him started" that he was asking

16

Johnson how many ounces of cocaine Johnson wanted Bell to give to a customer. It is my opinion that when Johnson replied, "I'm thinking two or three sand and four hard…," that he was referring to Bell giving the customer seven ounces of cocaine—three ounces of cocaine HCL and four ounces of cocaine base.

    d.  On September 27, 2018, at approximately 5:16 p.m., Johnson, using Target Telephone 7, placed a call to telephone number (850) 630-0977, and spoke to a black male, who Johnson called "Bullet."  During the call, Johnson said, "…it's three and a half." Bullet said, "I'll get it."  Johnson explained how on the previous night he added some cocaine that had a higher purity to the cocaine that he had available to sell.  Johnson said, "I can get him to pull up on you with that…unless you want to wait."  Bullet responded, "…it actually don't matter if I just get just two of them…or every bit of it".  Johnson said, "you want the rock, right?"  Bullet responded in the affirmative.  Johnson said, "Alright I am calling him now."  It is my opinion that in this conversation, Johnson agreed to have someone, who I believe is Bell, deliver between two and three and a half ounces of cocaine base to Bullet.

    e.  On September 27, 2018, at approximately 5:18 p.m., Johnson, using Target Telephone 7, placed a call to telephone number (850) 896-3312, and spoke to a black male, who I believe is Derek Bell.  During the call, Johnson said,

"...take all of them to ugh, to ugh Bullet." Bell acknowledged that order. Johnson said, "take him the three, take him the three, keep the half." Bell again acknowledged. Johnson said, "keep the half so you keep the money even." It is my opinion that during this call, Johnson directed Bell to complete the drug transaction with Bullet that Johnson had set up in the previous call.

f. On October 1, 2018, at approximately 10:33 a.m., Johnson, using Target Telephone 7, placed a call to telephone number (850) 896-3312, and spoke to a black male, who I believe is Derek Bell. During the conversation, Johnson said, "I forgot to give you all that damn dope I had. Some of it is still over at the (unintelligible)." Johnson said, "this shit laying right here." Bell asked, "so that wasn't all...?" Johnson said, "...you're probably missing like a zip." I know that drug dealers will refer to drugs as "dope" and will refer to an ounce quantity of a drug as a "zip." Based on that I believe that in that call, Johnson was telling Bell that Johnson had drugs with him that he had intended to give to Bell ("I forgot to give you all that damn dope" and "this shit laying right here").

**Intercepted call indicating Johnson stored cocaine in his residence**

16. On September 29, 2018, at approximately 1:37 p.m., Johnson, using Target Telephone 7, placed a call to telephone number (850) 896-3312, and spoke to a black male, who your affiant believes was Derek Bell. During the call, Bell

said, "I got like five left." Johnson questioned, "You got like five zips left?" Johnson, while maintaining the call with Bell, was heard speaking to a female over another telephone. Johnson asked, "You still at the house?" The female responded, "Yes." Johnson told the female to, "set me up a four-way." The female questioned Johnson and he replied, "of the sand…it will be 140 grams, 142 grams." Johnson continued and told the female to "put it in one bag." The female responded in the affirmative. Johnson said, "Give it to Derek." The female asked, "Where is everything?" Johnson then gave the female instructions, at one time saying, "in the cabinet by the refrigerator." Your affiant knows that the term "zips" is a term used by drug dealers when referring to ounce quantities of a drug. Based on that, I believe that Bell was telling Johnson that he only had five ounces of cocaine left when he said "I got like five left" and Johnson responded "you got like five zips left?" I also know that when drug dealers use the term "sand," they are referring to cocaine HCL. Therefore, I believe that Johnson was instructing a female, who was at Johnson's residence ("you still at the house?") to prepare 142 grams of cocaine for Bell. I also believe, based on the fact that Johnson instructed the female to prepare a bag of cocaine for Bell, and that the female was at "the house," Johnson stores cocaine at the **Subject Premises**.

**Muta Bolden identified as cocaine supplier to Johnson**

17.  Intercepted calls over Target Telephone #7 show that one of Johnson's cocaine suppliers was Muta Bolden ("Bolden").  The following is just one of the calls between Johnson and Bolden, which in my opinion show this relationship of cocaine supplier (Bolden) and buyer (Johnson):

a.  On September 27, 2018, at approximately 15:21 p.m., Johnson, using Target Telephone 7, placed a call and spoke to Muta Bolden.  During the call, Bolden said, "Shit I think I might need like twenty." Johnson responded, "Twenty shit that's all I got right now is twenty."  Bolden said, "Shit uhh ah man see if you can get it up man see if you can god damn get me like uh like see if you can bet me like twenty-seven, if you want the twenty seven back I'll give you the twenty-seven and if you want one ill just give you one for twenty-seven."  After more conversation, Johnson said, "Let me see how much money I got, um, I picked up a lot of money yesterday, let's see what I got over there I figured I had like ten band over there at the house, I probable got that's probably what I got, let's see what I picked up, I picked up seven, five, nine, nine, I probable got twenty-seven that's all I probably got."  After further conversation, Johnson said, "These niggas aint making no money though bro, give it to nigga for a band he still sell it for ten five he making five hundred off of every ounce.  At the conclusion of the conversation, Johnson said, "I ain't in the streets so, this what I'm telling you, if I stop, if I lay

down for a month right, this is if I lay down and don't serve nobody for a couple weeks, about four, nigga I still got to pay my payroll, I still got to pay my bills, you know what I'm saying, how the hell am I supposed to pay my bills this shit is what is keeping me afloat." It is my opinion that during this call, Bolden was trying to convince Johnson to pay $27,000 to Bolden for a cocaine debt that Johnson owed to him ("see if you can god damn get me like uh like see if you can bet me like twenty-seven…). It is also my opinion that Bolden offered to give one kilogram of cocaine to Johnson if Johnson could come up with the money ("if you want one ill just give you one for twenty-seven.") I believe that Johnson was telling Bolden that he would attempt to gather the $27,000 when he said, "Let me see how much money I got, um, I picked up a lot of money yesterday, let's see what I got over there I figured I had like ten band over there at the house, I probable got that's probably what I got, let's see what I picked up, I picked up seven, five, nine, nine, I probable got twenty-seven that's all I probably got." I know that drug dealers refer to one thousand dollars as a "band." Therefore, I believe that when Johnson said he had "ten band" at "the house," that he was referring to having $10,000 at the **Subject Premises**. I also believe that in this conversation, Johnson showed that he has other persons who sell drugs for him, when he said "give it to nigga for a band he still sell it for ten five he making five hundred off of every ounce." It is my

opinion Johnson was referring to giving a drug dealer $1000 ("a band") worth of cocaine and that the drug dealer sold the cocaine for $1500 ("sell it for ten five"), thus making $500 per ounce ("he making five hundred off of every ounce").

## ARREST OF MUTA BOLDEN IN DOTHAN, ALABAMA

18.  On January 28, 2019, the Honorable Emily C. Marks, United States District Judge for the Middle District of Alabama, signed an order authorizing the interception of communications over two telephone numbers used by Bolden.

19.  As a result of the information obtained through the interception of communication over Bolden's cellular telephones, on February 8, 2019, DEA and other law enforcement agencies arrested Bolden, and others, after seizing approximately 25 kilograms of cocaine in Dothan, Alabama.

20.  Agents subsequently conducted a post-Miranda interview of Bolden. After having been advised of his rights and having waived those rights, Bolden said that he usually sold one to five kilograms of cocaine at a time to Ronnie Johnson of Panama City, Florida.  Bolden also said that he and Johnson had previously agreed that Bolden was going to bring 10 of the 25 kilograms of cocaine that law enforcement seized on February 8, 2019, to Johnson.

## JOHNSON OFFERS TO SELL COCAINE TO THE CS

21.  On April 15, 2019, the DEA conducted a controlled meeting between Johnson and the CS at 2230 N. East Street, Panama City, Florida.  Law enforcement searched the CS prior to and after the meeting with Johnson with negative results for contraband.  Law enforcement also provided a transmitter to the CS prior to the meeting and conducted surveillance of the meeting.  Johnson arrived and left the meeting driving a white Dodge pickup truck, bearing Florida license plate #KDWA17.  The registered owner for that white Dodge pickup truck is Fekecia Manley at 1404 Flower Avenue, Panama City, Florida. After the meeting, agents met with the CS.  The CS told agents that Johnson said he could sell cocaine to the CS.  Agents listened to the audio recording of the meeting and confirmed that Johnson said he could sell cocaine to the CS.  This showed that Johnson as of April, 2019, continued to sell cocaine in the Panama City area.

## JOHNSON SELLS TWO OUNCES OF COCAINE TO THE CS ON JUNE 7, 2019

22.  On June 7, 2017, the DEA conducted a controlled purchase of approximately two ounces of cocaine from Ronnie Johnson in Panama City, Florida, using the CS.  Prior to Johnson meeting with the CS, law enforcement surveillance saw Johnson leave the **Subject Premises** and travel to meet with the

23

CS.  At that meeting, Johnson sold two ounces of cocaine to the CS.  The

following is a summary of some of the events conducted or observed by law

enforcement and a summary of what the CS told law enforcement about his/her

meeting with Johnson:

a.  On June 6, 2019 at approximately 7:57 p.m., law enforcement monitored

and recorded a telephone call between the CS and Johnson.  During that call,

Johnson agreed to meet with the CS on the following day in order to sell two

ounces of cocaine to the CS for $2100.

b.  On June 7, 2019, at approximately 3:00 a.m., law enforcement observed

the same white Dodge pickup truck that Johnson was driving when he met with the

CS on April 15, 2019, parked in the driveway of the **Subject Premises**.

c.  On June 7, 2019, agents met with the CS.  Agents searched the CS and

the CS' vehicle with negative results for drugs or excessive money.  Agents then

provided the CS with $2100 to use to purchase the cocaine from Johnson.  Agents

also fitted the CS with a transmitter and recording device to use during the

forthcoming meeting with Johnson.

d.  On June 7, 2019, at approximately 9:44 a.m., law enforcement monitored

and recorded a telephone call between the CS and Johnson.  During the call,

Johnson said that he was presently in Callaway and would meet with the CS.

24

e.  After the telephone call, law enforcement followed the CS to 2230 N. East Avenue, Panama City, Florida.

f.  On June 7, 2019, at approximately 10:01 a.m., Johnson walked from the **Subject Premises** to the white Dodge pickup truck.  (From their observation point, agents were not able to see the front door of the residence.)  Johnson then walked back towards the residence.  A few minutes later, the white Dodge pickup truck left the **Subject Premises** and traveled to 628 Camellia Avenue, Callaway, Florida, where the white Dodge pickup truck parked in the backyard.  After approximately two minutes, the white Dodge pickup truck left the residence at Camellia Avenue and traveled to 2230 N. East Avenue, Panama City, Florida.

g.  When Johnson arrived at that location at approximately 10:29 a.m., the CS walked to and entered the passenger seat of the white Dodge pickup truck. Agents were able to confirm using the monitoring device that the driver of the white Dodge pickup truck was Johnson.  Agents were able to hear the conversation between Johnson and the CS.  After approximately 15 minutes, the CS walked to his/her vehicle and departed the area.  Agents followed the CS and met with him/her at a predetermined location.  The CS then gave a plastic bag containing approximately two ounces of suspected cocaine to the agents, which the CS said

5:19mj31-MJF

he/she purchased from Johnson in exchange for the $2100 at the aforementioned meeting. The substance was field-tested, and tested positive for cocaine.

## ADDITIONAL INFORMATION REGARDING THE SUBJECT PREMISES

23. Based on information obtained throughout this investigation, your affiant believes that Johnson resides at the **Subject Premises**. Gulf Power records show that the customer name for the electric power at the **Subject Premises** in September 2018, was Fekecia Manley, who I believe is Johnson's live-in girlfriend. The Gulf Power records listed Ronnie Johnson in the "other customer information" section for the **Subject Premises**. I confirmed with Gulf Power that as of May 31, 2019, the customer name for the electric power at the **Subject Premises** was still in the name of Fekecia Manley. In addition, periodic observations at the **Subject Premises** by law enforcement over the past eight months has shown that Johnson resides at the **Subject Premises**. As noted above, intercepted telephone calls show that Johnson manages and controls the distribution of cocaine in Panama City, Florida. Based on what I have learned from prior narcotics investigations I have participated in, I believe that there will be evidence of Johnson's cocaine trafficking at his residence. Additionally, as

26

detailed in this affidavit, on June 7, 2019, Johnson left the **Subject Premises** prior to delivering cocaine to the CS.

24.  Based upon the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1), and 846 have occurred and that evidence of the sale or distribution of cocaine or other controlled substances is located in the **Subject Premises**.

_____
SA John Manna, DEA


Sworn to and subscribed before me this 21st day of June, 2019


/s/ *Michael J. Frank*
_____
Michael J. Frank
United States Magistrate Judge

## Attachment A

The **Subject Premises** is located at 323 Michele Drive, Callaway, Florida. Your affiant seeks authorization to search the **Subject Premises** and all outlying buildings located on the property. The **Subject Premises** is further described as a single-family dwelling with an attached garage, white trim, and a brown shingle roof located inside the Forest Walk Subdivision. The front of the dwelling has a brick face. The back of the dwelling is off-white siding. The north side of the dwelling is white siding. The numbers "323" are in grey numerals on a white placard, which is mounted above a white garage door on the front of the dwelling. The front door is white in color and faces to the east. There is a cement driveway that leads to a two-car attached garage. Michele Drive is located on the north side of Highway 22 and is one block east of Callaway Park Way. Michele Drive is the only entrance and exit to the Forest Walk subdivision. There is a red brick wall with gold colored letters that reads "Forest Walk" at the intersection of Michele Drive and Highway 22. The house is located on the northwest corner of Michele Drive, at a point where there is a 90-degree turn in Michele Drive. The rear of the **Subject Premises** is along Callaway Park Way.

# ATTACHMENT B

The items to be seized are as follows:

a.     Cocaine or other controlled substances;

b.     Documents and photographs describing the price, quantity, receipt, purchase, sale, storage, distribution, or ownership, of cocaine, or other controlled substances;

c.     Documents describing orders for, or money received or paid in exchange for, cocaine, or other controlled substances;

d.     Documents which list the names, addresses, and telephone numbers of partners or associates in the illegal importation, sale, or distribution of cocaine, or other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), and 846;

e.     Financial ledgers, pay and owe sheets, and personal phone books, which show importation, sales, distribution, or possession of cocaine or other controlled substances;

f.     Cash derived from the importation, sale, or distribution of cocaine or other controlled substances, in violation of Title 21, United States Code, Sections 841 and 846;

1

g.    Paraphernalia commonly associated with the importation, packaging, distribution, and sales of cocaine or other controlled substances (such as scales, weighing devices and measuring devices, packaging materials);

h.    Any indicia of ownership, occupancy, possession, or control of the locations, motor home or things listed in this attachment, including utility and other bills, correspondence, lease or rental agreements or receipts, trust deeds, escrow documents and registration documents; and

i.    Cellular telephones and electronic devices.  A secondary warrant will be sought before the search of any cellular phones or electronic devices.